## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDRE WILSON, Derivatively on Behalf of Nominal Defendant AQUESTIVE THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> GREGORY B. BROWN, M.D., DANIEL BARBER, JOHN COCHRAN, ABIGAIL L. JENKINS, JULIE KROP, M.D., TIMOTHY E. MORRIS, MARCO TAGLIETTI, M.D., and MELINA T. CIOFFI, PHARM. D., <br><br> Defendants, <br><br> and <br><br> AQUESTIVE THERAPEUTICS, INC., <br><br> Nominal Defendant. | Case No. <br><br> **<u>JURY TRIAL DEMANDED</u>** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Andre Wilson ("Plaintiff"), by and through his undersigned attorneys, brings this shareholder derivative action for the benefit of the nominal defendant Aquestive Therapeutics, Inc. ("Aquestive" or the "Company") against the current members of the Company's Board of Directors (the "Board") and certain executive officers (collectively, the "Individual Defendants," as defined below) for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a); Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9; and violations of state law, including breach of fiduciary duties, aiding and abetting the breach of fiduciary duties, and waste of corporate assets.

Plaintiff alleges the following based upon personal knowledge as to himself and his own

acts, and upon information and belief as to all other matters based upon the investigation conducted by and through his attorneys which included, *inter alia*, review of publicly available documents concerning the Company; announcements and statements issued by Defendants; filings with the United States Securities and Exchange Commission ("SEC"); applicable regulatory guidance; filings in litigation concerning the Company; press releases published by, and regarding, the Company; news reports; conference call transcripts; securities analysts' reports; and other publicly available information. Plaintiff believes that substantial additional evidence in support of his claims will be adduced following a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Aquestive, a Delaware corporation headquartered at 30 Technology Drive, Warren, New Jersey, is a pharmaceutical company "developing pharmaceutical products to deliver complex molecules through administrations that are alternatives to invasive and inconvenient standard of care therapies."[1] While the Company's current sales and revenues derive primarily from sublingual film formulations of third-party products, its "long-term growth strategy is to develop and commercialize a portfolio of product candidates . . . ."[2]

2.      Aquestive's lead product candidate is Anaphylm, described as "the first and only non-device based, orally delivered epinephrine product candidate in development that has shown clinical results comparable to auto-injectors (such as EpiPen® and Auvi-Q®) for the emergency treatment of allergic reactions, including anaphylaxis."[3] Anaphylaxis, a severe systemic allergic

---

[1] Aquestive Form 10-K for the fiscal year ended December 31, 2024, filed with the SEC on March 5, 2025 ("2024 Form 10-K"), p. 3, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001398733/000139873325000016/aqst-20241231.htm.

[2] *Id*., p. 47.

[3] *Id*., p. 12.

reaction, occurs within minutes, if not seconds, of allergen exposure and can lead to death from airway restriction or cardiac arrest. The standard emergency treatment for anaphylaxis is the intramuscular injection of epinephrine in the thigh by auto-injector. Aquestive stated that because "many patients and their caregivers are reluctant to use injectable products," Anaphylm, "a dissolvable strip, approximately the size and weight of a postage stamp," "is well positioned as a non-device based treatment option . . . due to its comparable efficacy to existing auto-injector and nasal spray products, easy portability and convenience of use."[4]

3.       Aquestive commenced efforts to develop Anaphylm in 2022. Following successful clinical trials in 2023 and 2024, Aquestive announced on March 5, 2025 that it had commenced the New Drug Application ("NDA") process for Anaphylm with the United States Food and Drug Administration (the "FDA"). Because the FDA had not previously authorized the sublingual administration of epinephrine for emergency use, Aquestive was required to conduct a human factors validation study as part of the NDA to demonstrate that Anaphylm could "be used by the intended users *without serious use errors or problems,* for the intended uses *and under the expected use conditions*."[5]

4.       In response, the Company conducted a 166 participant human factors validation study to demonstrate that Anaphylm was suitable to treat allergic reaction emergencies, including anaphylaxis (the "HFV Study"). The results of the HFV Study, which  were submitted as part of

---

[4] *Id.*, pp. 5, 12.

[5] U.S. Food and Drug Administration, *Applying Human Factors and Usability Engineering to Medical Devices; Guidance for Industry and Food and Drug Administration Staff; Availability*, (Feb. 3, 2016) (the "Human Factors FDA Guidance"), p. 20 (footnote omitted) (all emphasis added unless otherwise noted), https://www.fda.gov/media/80481/download. The FDA defines "Use error" as "[u]ser action or lack of action that was different from that expected by the manufacturer and caused a result that (1) was different from the result expected by the user and (2) was not caused solely by device failure and (3) did or could result in harm." *Id.*, p. 3.

the Anaphylm NDA, were subject to review by the FDA's Division of Medication Error Prevention and Analysis (the "DMEPA"), the dedicated human factors review unit with "primary responsibility for the review of . . . [human factors] submissions for NDAs . . . ."[6] On April 1, 2025, the Company announced that it had fully submitted the Anaphylm NDA to the FDA.

5.      The HFV Study, however, was deficient because it revealed "*use errors or problems that could result in serious harm* . . . ."[7] Specifically, one child participant in the HFV Study was unable to open the pouch containing Anaphylm; six participants tore the strip while opening the pouch; four participants failed to place the strip under their tongues for sublingual administration; and four participants prematurely removed the Anaphylm strip – two participants because of taste and two participants because of a burning sensation. These use errors and problems – which could delay the administration of epinephrine or cause the administration of an inaccurate dose – could cause serious harm because, "*[i]f not treated immediately, anaphylaxis can lead to death* . . . ."[8] Thus, far from supporting FDA approval, the results of the HFV Study supported denial of the NDA because Anaphylm was not suitable for its intended use: "to administer *a reliable*

---

[6] Center for Drug Evaluation and Research, *Manual of Policies and Procedures 6701.1*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.fda.gov/media/131008/download#:~:text=2%20of%207-,BACKGROUND,includes%20recommendations%20from%20both%20divisions.

[7] *Human Factors* FDA Guidance, p. 20. While non-binding, the FDA's guidance "represents the Food and Drug Administration's . . . current thinking on this topic. . . ." *Id*., p.1. While the FDA makes clear medical device manufacturers "can use an alternative approach" rather than follow the guidelines, that alternative approach must "satisf[y] the requirements of the applicable statutes and regulations." *Id*. There is no indication that Aquestive used an alternative approach. In fact, Defendant Cioffi acknowledged that the Company was following the guidance, albeit unsuccessfully, stating that "the human factor study expectations are outlined by the agency in human factor guidances . . . ." Melina Cioffi, *Aquestive Therapeutics, Inc. (AQST) Discusses FDA Complete Response Letter and Next Steps for Anaphylm Epinephrine Sublingual Film Transcript* (Feb. 2, 2026) ("CRL Call Tr."), p. 14/23, https://seekingalpha.com/article/4864935-aquestive-therapeutics-inc-aqst-discusses-fda-complete-response-letter-and-next-steps-for.

[8] 2024 Form 10-K, p. 10.

*and accurate dose* of epinephrine *as quickly as possible*" which, in an anaphylaxis emergency, is "*critical* for patient recovery and *survival.*"[9]

6.      Significantly, the Individual Defendants knew, or should have known, of the negative HFV Study results prior to submission to the FDA. Upon completion, human factors validation study results are subject to qualitative analysis by product sponsors, like Aquestive, to "determine if the design of the device (or the labeling or user training) *needs to be modified to reduce the use-related risks* to acceptable levels."[10] The Individual Defendants, who participated in that analysis, reviewed that analysis, and/or had access to information from that analysis, knew and/or in the exercise of adequate oversight should have known, of the negative incidents in the HFV Study prior to its submission to the FDA.

7.      Moreover, because FDA approval and the successful commercialization of Anaphylm were "mission critical" for Aquestive, the Board should have adequately monitored all aspects of the NDA submission process, including the results of the HFV Study. Anaphylm's critical importance to the Company was made clear in a May 12, 2025 press release announcing first quarter 2025 financial results and the submission of the Anaphylm NDA to the FDA. In that press release, Defendant Barber was quoted as stating:

> we believe that we are the potential best-in-class epinephrine therapy in a multi-billion dollar growing market. *Going forward we will have complete focus on our pre-commercial preparedness and the FDA approval process for Anaphylm. From now until post-launch, we will de-emphasize other activities* such as the advancement of AQST-108, and we will not appeal the court decision on Libervant. *This will focus resources, both people and financial, towards the upcoming launch of Anaphylm, if approved by the*

---

[9] *Id*.

[10] The *Human Factors* FDA Guidance, p. 26.

*FDA*.[11]

Consistent with Defendant Barber's pronouncement, the development of Anaphylm accounted for more than **92%** of the Company's Total Project Costs in 2024 and 2025.[12] Dedicating most of Company's financial and personnel resources to the development of Anaphylm, and away from other products, could not have been done without the knowledge and consent of the Board. The Board's fiduciary duties, however, went beyond mere approval of resource allocation for Anaphylm, and required that Board members adequately monitor the regulatory process for FDA approval of this mission critical product.

8.       The Individual Defendants also had a fiduciary duty to remediate the use errors and problems uncovered in the HFV Study. These were "red flags" that the FDA would deny the NDA because Anaphylm was not suitable for use in an anaphylaxis emergency. Likewise, the *Human Factors* FDA Guidance counseled that "the human factors validation test results should show ***no use errors or problems that could result in serious harm*** and that could be ***eliminated or reduced through modification of the design of the user interface*** . . . ."[13] The Individual Defendants, however, failed to cause Aquestive to take any remedial action, such as redesigning the Anaphylm packaging or revising the instructions.  Instead, the Individual Defendants caused and/or permitted Aquestive to submit the deficient HFV Study to the FDA which, in turn, precluded approval of the NDA because Aquestive had not shown that Anaphylm was suitable for its intended emergency

---

[11] AQST-108 was the next proprietary product in the Company's pipeline, and Libervant was Aquestive's only then-commercialized proprietary product.

[12] Aquestive Form 10-K for the fiscal year ended December 31, 2025, filed with the SEC on March 4, 2026 ("2025 Form 10-K"), p. 66, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001398733/000139873326000018/aqst-20251231.htm.

[13] *Human Factors* FDA Guidelines, p. 20.

use.

9.     By failing to adequately monitor the Anaphylm NDA submission process and/or act on the red flags in the HFV Study results, the Individual Defendants breached the fiduciary duties they owed to the Company and its shareholders.

10.     Additionally, the Director Defendants issued, and/or caused or permitted the issuance of, materially misleading statements in an April 25, 2025 proxy statement filed with the SEC on Schedule 14A (the "April 2025 Proxy"). The April 2025 Proxy, among other things, solicited shareholder votes for the re-election of certain Individual Defendants to the Board. The April 2025 Proxy described the purported oversight of Aquestive's management ("Management"), risk management, major drug developmental programs, and human studies exercised by the Board and its various committees.[14] Those statements were materially false and misleading, however, because the April 2025 Proxy failed to disclose the oversight failures that caused the Company to submit the deficient HFV Study to the FDA as part of the Anaphylm NDA.

11.     In addition, the Individual Defendants breached their fiduciary duties by issuing, and/or causing or permitting the issuance of, materially false and misleading statements concerning the status of the Anaphylm NDA. Certain Individual Defendants stated, and/or caused or permitted the Company to state, that the Anaphylm NDA was "on track" for approval by the January 31, 2026 PDUFA date[15]; that the FDA's review was proceeding on schedule; and that there was "nothing new or of consequence" emerging from communications with the FDA. The Individual Defendants, however, concealed the material adverse information concerning the HFV Study

---

[14] 2025 Proxy, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001398733/000114036125015781/ny200430 36x1_def14a.htm.

[15] The PDUFA date is the deadline for the FDA to act on a drug application under the Prescription Drug User Fee Act.

deficiencies, making such statements materially false and misleading in violation of the federal securities laws. The Individual Defendants' misconduct breached the fiduciary duties they owed to the Company and its shareholders.

12. Information concerning the Individual Defendants' misconduct was partially revealed on January 9, 2026, when the Company issued a press release disclosing that the FDA had notified Aquestive that "deficiencies in the NDA . . . preclude[d] discussion of labeling and post-marketing commitments at this time" – a prerequisite for approval of the NDA by the January 31, 2026 PDUFA date. On this news, the price of Aquestive common stock declined more than 37%, from a closing price of $6.21 per share on January 8, 2026 to a close of $3.91 per share on January 9, 2026.

13. More complete information concerning the Individual Defendants' misconduct was subsequently revealed on January 30, 2026, when the Company announced that the FDA had issued a Complete Response Letter ("CRL"), formally declining to approve the Anaphylm NDA. The CRL confirmed that the NDA denial was based on the deficient HFV Study. According to Aquestive, the CRL "focused on administration and labeling guidance," specifically citing the "instances of difficulty opening the pouch and incorrect film placement which, if unaddressed, the FDA believes could cause significant safety issues in the setting of anaphylaxis."[16] In response, Aquestive stated that it "modified the pouch opening, instructions for use, pouch and carton labeling, and plans to conduct a new HFV Study with these modifications."[17] The FDA's clinical pharmacology division "requested a single PK [pharmacokinetic] study to understand the impact

---

[16] 2025 Form 10-K, p. 5.

[17] *Id*.

of any modifications to packaging and labeling" made by Aquestive.[18] The Company estimated that it would be unable to resubmit the revised Anaphylm NDA until the third quarter of 2026.[19]

14.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered, and continues to suffer, substantial harm. On March 5, 2026, a securities class action, *Modica v. Aquestive Therapeutics, Inc., et al.*, Case No. 3:26-cv-02317-ZNQ-RLS (D. N.J.) (the "Securities Class Action") was filed, requiring Aquestive to expend significant costs to defend itself and exposing the Company to substantial class-wide liability. Aquestive has also expended, and will continue to expend significant costs in connection with the revised Anaphylm NDA, including costs associated with a supplemental pharmacokinetic study. Moreover, Aquestive must now pay millions in interest payments on debt that was to be retired in conjunction with a financing agreement which has been delayed by the FDA's denial of the Anaphylm NDA.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, as amended. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation with its principal place of business in this District, or is an officer and/or director of such corporation who has received compensation from the Company and/or the Company's stockholders and/or otherwise has had sufficient contacts with this District.

---

[18] *Id.*

[19] *Id.*

18. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

19. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401, as well as Section 27(a) of the Exchange Act because: (a) Aquestive maintains its principal executive offices in this District; (b) Defendants conducted business in this District and have sufficient minimum contacts with this District; and (c) a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

### *Plaintiff*

20. Plaintiff is a current shareholder of the Company and has continuously held shares of Aquestive stock since 2021.

### *Nominal Defendant*

21. Nominal Defendant Aquestive is a pharmaceutical company incorporated in Delaware and headquartered in Warren, New Jersey, which develops and commercializes medicines using its proprietary film-based drug delivery technology. The Company's common stock trades on the Nasdaq Global Select Market under the ticker symbol "AQST."

### *Director Defendants*

22. Defendant Gregory B. Brown, M.D. ("Brown") has been a Company director since March 2007 and has been the Chairman of the Board since April 2024. Defendant Brown is a member of the Board's Compensation Committee, Audit Committee, and Science and Technology Committee. He is also the CEO and director of Memgen, LLC, a private clinical-stage

biotechnology company, and a co-founder of HealthCare Royalty Partners, or HCRx, and a member of its Senior Advisor Board.

23.    Defendant Daniel Barber ("Barber") has been a director, the CEO, and the President of the Company since May 2022. Defendant Barber joined Aquestive in July 2007 and, from May 2019 until May 2022, served as the Company's Chief Operating Officer ("COO"). According to the Company's website, in 2010, Defendant Barber had executive oversight of the Company's launch activities for Aquestive's first two FDA approved products and, in 2013, he "helped lead the company's effort to develop an internal pipeline of proprietary assets" and "[s]ince that time, he has had executive responsibility for Aquestive's pipeline and partnership activities." In 2024, Defendant Barber was paid a base salary of $633,376.00 and, pursuant to the terms of his employment agreement, is entitled to a target bonus opportunity of 60% of his annual base salary. In 2024, Barber received $1,377,968.00 in stock awards; $1,706,036.00 in option awards; $435,600.00 in Non-Equity Incentive Plan Compensation; and additional compensation of $28,492.00, for total compensation of $4,181,472.00. Defendant Barber is named as a defendant in the Securities Class Action.

24.    Defendant John Cochran ("Cochran") has been a director of the Company since 2004. He is the Chairperson of the Board's Nominating and Corporate Governance Committee and the Compensation Committee. Since October 1998, Defendant Cochran has been a partner at Bratton Capital Management L.P. ("Bratton"), responsible for its private equity investments. As of March 30, 2026, Bratton was the largest institutional holder of Aquestive stock, holding 9,810,958 shares, or 8.04% of the outstanding shares, worth approximately $ 39,440,000. That investment in Aquestive is Bratton's only asset.

25.    Defendant Abigail L. Jenkins ("Jenkins") has been a director of Aquestive since

11

2024. She is a member of the Board's Nominating and Corporate Governance Committee. According to the Company's website, Defendant Jenkins "is an experienced biopharmaceutical executive and board director with more than 25 years of leadership across public and private biotech and pharmaceutical companies." It further states that, as the former President, Chief Executive Officer, and director of Gamida Cell, Ltd. (NASDAQ: GMDA), Defendant Jenkins "led the company through the FDA approval and launch of Omisirge®, the first-ever allogeneic hematopoietic stem cell donor source approved in the United States."

26.    Defendant Julie Krop, M.D. ("Krop") has been a director of Aquestive since 2021. She is a member of the Board's Nominating and Corporate Governance Committee. Defendant Krop is also the Chief Medical Officer ("CMO") of DiaMedica Therapeutics, Inc. (Nasdaq:DMAC), a clinical-stage biopharmaceutical company focused on development of novel treatments for pre-eclampsia, fetal growth restriction, and acute ischemic stroke. Among other positions, Defendant Krop has previously served as the CMO of PureTech Health plc, Freeline Therapeutics, and AMAG Pharmaceuticals. The Company's website states that Defendant Krop has "extensive experience in successfully designing and executing clinical development programs from early-stage development through FDA approval," having served in "senior leadership roles across clinical development, regulatory affairs, clinical operations, pharmacovigilance, medical affairs and program management during her career . . . ."

27.    Defendant Timothy E. Morris ("Morris") has been a director of Aquestive since 2022. He is Chairperson of the Board's Audit Committee and a member of its Compensation Committee. Among other positions, Defendant Morris is the founder and Managing Member of Aacolade Pharma, LLC, a boutique advisory firm assisting biotechnology and pharmaceutical companies with fundraising, business development, and governance, and was previously the COO

of Humanetics Corporation, a privately-held advanced clinical-stage specialty pharmaceutical company.

28.    Defendant Marco Taglietti, M.D. ("Taglietti") has been a director of Aquestive since 2021. He is a member of the Board's Audit Committee and Science and Technology Committee. Defendant Taglietti  is also currently the CEO of NanoNewron, a biotechnology company developing innovative, humanized biologics that cross the blood-brain barrier to treat Alzheimer's and other central nervous system neurodegenerative disease. Among other positions, Defendant Taglietti was a director,  President, and CEO of Scynexis Inc.; President, CMO, and Executive Corporate Vice President, Research & Development at Forest Laboratories (now AbbVie); and Senior Vice President, Head of Global Research and Development at Stiefel Laboratories, Inc. (now a subsidiary of GlaxoSmithKline).

29.    The Defendants identified in ¶¶ 22-28 above are collectively referred to herein as the "Director Defendants."

*Officer Defendants*

30.    Defendant Melina T. Cioffi, Pharm. D. ("Cioffi") has been Aquestive's Vice President of Regulatory Affairs since August 2020 and leads Regulatory Affairs at the Company. The Company's website describes Defendant Cioffi as "a dedicated Regulatory Affairs expert with over 20 years of experience in the pharmaceutical industry" who has "led numerous interactions with FDA, transforming regulatory challenges into opportunities for organizational growth."

31.    The Defendants identified in ¶¶ 23 and 30 above are collectively referred to herein as the "Officer Defendants" and, together with the Director Defendants, the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     Because of their positions as directors and/or officers of Aquestive, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Aquestive and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage Aquestive in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33.     Each director and/or officer of the Company owes to Aquestive and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Aquestive, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     To discharge their duties, the directors and/or officers of Aquestive were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the directors and/or officers of Aquestive were required, among other things, to:

> (a)     exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner, in compliance with all applicable federal and state laws, rules, regulations and requirements;
>
> (b)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, avoid waste of the Company's assets, and maximize the value of Aquestive stock;

14

(c)    remain informed as to how Aquestive conducted its operations, including the accuracy and completeness of its public disclosures regarding business operations and prospects and, if necessary, take steps to correct misleading statements to comply with applicable laws;

(d)    maintain and implement an adequate system of internal legal, financial, and management controls, to ensure the Company's compliance with applicable laws, regulations, and rules; and

(e)    provide accurate operational and financial guidance to investors and analysts regarding the true condition and business prospects of Aquestive.

36.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Aquestive, and were acting within the course and scope of such agency.

37.    Because of their directorial, advisory, executive, and managerial positions with Aquestive, each of the Individual Defendants had knowledge of, or access to, material non-public information regarding the Company.

38.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

## CORPORATE GOVERNANCE GUIDELINES

39.    In addition to their fiduciary duties, the Aquestive Therapeutics, Inc. Corporate Governance Guidelines (the "Governance Guidelines") imposed specific duties on the members of the Board. In pertinent part, the Governance Guidelines provide:

> The Board of Directors (the "Board") of Aquestive Therapeutics, Inc. (the "Company") has the responsibility to organize its functions and conduct its business in the manner it deems most effective and efficient, ***consistent with its duties of good faith, due care and loyalty.***

*    *    *

**2.    Role of Board.**

> The Board serves as the representative and acts on behalf of all of the Company's stockholders. In representing the Company's stockholders, ***the basic responsibilities of each director on the Board are to exercise his or her business judgment in good faith and to act in what he or she reasonably believes to be the best interests of the Company and its stockholders.*** . . . The Board's primary

15

functions are to:

a.    ***Oversee management*** in the conduct of the Company's businesses;

b.    Oversee management's efforts to ***establish and maintain the highest standards of legal and ethical conduct*** in all of the Company's businesses, including conformity ***with all applicable laws and regulations;***

\*        \*        \*

k.    Ensure that ***effective systems are in place for periodic and timely reporting to the Board*** on important matters concerning the Company, including the following:

i.    Current business and financial performance, ***the degree of achievement of approved objectives and the need to address forward-planning issues***;

ii.    Future business prospects and forecasts, ***including actions,*** facilities, personnel and financial resources ***required to achieve forecasted results***; . . .

iv.    ***Compliance programs to assure the Company's compliance with law and corporate policies***;

v.    Material litigation and ***governmental and regulatory matters***;

\*        \*        \*

**7.    Other Matters**

a.    <u>Ethics and Compliance</u>. The Company will maintain, and ***the Audit Committee will oversee compliance with, the Code of Conduct*** for its employees, ***including its executive officers, and its directors***. . . .

40.    The Board, however, failed to exercise adequate oversight as required by its members' fiduciary duties and the Governance Guidelines. Despite the red flags in the HFV Study, the Board failed to exercise adequate oversight over Management which, in turn, failed to cause the redesign of the Anaphylm packaging or revision of the instructions for use, causing Aquestive to submit the deficient HFV Study to the FDA as part of the Anaphylm NDA. The Board also failed to exercise adequate oversight over compliance with applicable law, specifically whether the public statements concerning the deficient HFV Study results violated the federal securities

laws.

## CODE OF BUSINESS CONDUCT AND ETHICS

41. The Aquestive Therapeutics, Inc. Code of Business Conduct and Ethics (the "Code

of Conduct"), in pertinent part, provides:

> Aquestive Therapeutics, Inc. (the "Company" or "Aquestive") is committed to ethical and ***lawful behavior*** and seeks to ensure that its standards are not compromised and that ***it does not violate laws and regulations***.

*  *  *

> **Upholding the Law**
>
> Aquestive's commitment to integrity begins with ***complying with laws, rules and regulations*** where we do business. Further, each of us must have an understanding of Company policies, laws, rules and regulations that apply to our specific roles. If you are unsure of whether a contemplated action is permitted by law or Aquestive policy, you should seek advice from the Chief Compliance Officer. ***We are all responsible for preventing violations of law*** and for speaking up if we see possible violations.

*  *  *

> **Set Metrics and Report Results Accurately**
>
> **Accurate Public Disclosures**
>
> We will ensure that ***all disclosures made in reports and documents that we file with, or submit to, the SEC and other public communications are full, fair, accurate, timely and understandable***. This applies to all Colleagues, including financial executives, with any responsibility for the preparation of such reports, including drafting, reviewing and signing or certifying the information contained therein. Each Colleague must take all steps available to assist the Company in these responsibilities consistent with his or her role within our organization. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Company's preparation of its public reports and disclosures. ***No business goal of any kind is ever an excuse for misrepresenting facts or falsifying records.***
>
> Colleagues should inform their Manager and the Chief Compliance Officer if they learn that information in any filing or public communication was untrue or misleading at the time it was made or if subsequent information would affect a similar future filing or public communication.

42.     The Company's directors and/or officers breached the duties imposed by Aquestive's Code of Conduct by issuing, causing and/or acquiescing in the issuance of materially misleading statements concerning the oversight exercised by the Board and its various committees, as well as the status of the Anaphylm NDA during the Relevant Period, in violation of the federal securities laws.

## SCIENCE AND TECHNOLOGY COMMITTEE

43.     The Charter of Aquestive's  Science and Technology Committee (the "Science Committee Charter") imposed additional duties and responsibilities on members of the Science and Technology Committee (the "Science Committee"), Defendants Krop, Brown, and Taglietti. The Science Committee Charter, in pertinent part, provides:

> **PURPOSE**
>  The purpose of the Committee shall be to ***assist the Board and senior management in its oversight of the Company's major development programs***, including the following: (i) ***review and evaluate the scientific activities related to the major development programs of the Company with respect to quality and scope*** . . . .
>
> **AUTHORITY AND RESPONSIBILITIES**
> The Committee shall have the authority and resources necessary to discharge its duties and responsibilities. The following are the principal recurring responsibilities of the Committee. . . .
>
> > <u>Advisory Role</u>. The Committee shall serve in an advisory role to assist the Company with scientific activities related to its major development programs.
> >
> > <u>Strategy Review</u>. The Committee shall review and advise the Company on the scientific strategy of the Company, ***including periodic reviews of the Company's major clinical programs and its overall competitiveness***.
> >
> > <u>Study Management Review</u>. The Committee shall periodically review ***the Company's oversight of risk management in the area of human studies, the Company's policies and procedures related to the conduct of human studies and the use and publication of data derived from such studies***.

44.    Aquestive's Science Committee breached the specific duties imposed by the Science Committee Charter by, among other things, failing to conduct or ensure adequate oversight of Anaphylm development, including the NDA submission process, despite that it was a "major clinical program." Likewise, the Committee failed to provide adequate oversight of the HFV Study – a "human study" – which was a critical component of the Anaphylm NDA, a "major development program." In addition, the Science Committee failed to adequately review the Company's oversight of risk management relating to human studies, allowing Aquestive to submit the deficient HFV Study to the FDA as part of the Anaphylm NDA.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

45.    Aquestive is a pharmaceutical company that described itself as "developing pharmaceutical products to deliver complex molecules through alternative administrations to invasive and inconvenient standard of care therapies." The Company utilized its patented PharmFilm technology, comprised of proprietary polymer compositions that serve as film formers to active pharmaceutical ingredients, for drug delivery. According to Aquestive, PharmFilm is "similar in thickness and size to a postage stamp, can be administered via buccal, sublingual or lingual oral delivery." The Company claimed that PharmFilm could be "engineered to fit a variety of target product profiles in order to best address unmet patient needs present within specific disease states."[20]

46.    The Company's lead product candidate was Anaphylm (epinephrine) Sublingual Film, a polymer matrix-based epinephrine prodrug formulated as a thin, dissolvable film designed

_____

[20] 2024 Form 10-K, p. 9.

to be placed under the tongue for the emergency treatment of Type I allergic reactions, including anaphylaxis. Anaphylaxis is a severe systemic allergic reaction that can be fatal if not treated immediately, with an estimated incidence rate of 50 to 112 episodes per 100,000 people per year.[21] The standard emergency treatment for anaphylaxis is the administration of epinephrine "via intramuscular injection (IM), including manual auto-injectors such as EpiPen and Auvi-Q, which require patients or their caregivers to inject epinephrine into the patient's thigh during an emergency allergic reaction." Aquestive claimed that "many patients and their caregivers are reluctant to use injectable products." Therefore, if approved by the FDA, the Company claimed that Anaphylm provided Aquestive with a competitive advantage as "a non-injectable, device-free, easier to administer product with a fast onset of action."[22]

47.    The development of Anaphylm began in 2022, following the successful completion of a Phase 1 clinical study conducted in Canada. In February 2022, the FDA approved the Investigational New Drug application ("IND") for Anaphylm and, in March 2022, granted it Fast Track designation for the emergency treatment of allergic reactions, including anaphylaxis. The Company conducted Anaphylm clinical and pharmacokinetic trials throughout 2022 and 2023.[23]

48.    FDA approval and the successful commercialization of Anaphylm are mission critical for Aquestive. In its 2024 Form 10-K, Aquestive stated that "[w]e have devoted most of our financial resources to product development."[24] The overwhelming majority of the Company's product development costs were expended on Anaphylm. In 2024 and 2025, Aquestive expended more than 92% of its Total Project Costs on Anaphylm – approximately $9.47 million of the 2024

---

[21] *Id.*, p. 16.

[22] *Id.*, p. 11.

[23] *Id.*, pp. 11-13.

[24] *Id.*, p. 30.

total of $10.26 million and approximately $5.8 million of the 2025 total of $6.3 million.[25]  In a

May 12, 2025 press release announcing first quarter 2025 financial results and the submission of

the Anaphylm NDA to the FDA, Defendant Barber was quoted as stating:

> Going forward we will have ***complete focus on our pre-commercial preparedness and the FDA approval process for Anaphylm***. From now until post-launch, we will ***de-emphasize other activities*** such as the advancement of AQST-108, and we will not appeal the court decision on Libervant. ***This will focus resources, both people and financial, towards the upcoming launch of Anaphylm, if approved by the FDA***.[26]

Likewise, in its 2025 Form 10-K, the Company reiterated that "[w]e continue to focus on our core

business and ***regulatory and pre-commercial launch activities for Anaphylm***."[27]

### B.   The FDA Approval Process

#### 1.   The HFV Study

49.   The sublingual administration of epinephrine had never been approved for use as

an emergency treatment for allergic reactions such as anaphylaxis. Therefore, in connection with

the Anaphylm NDA, the FDA required Aquestive to demonstrate: (i) pharmacokinetic evidence

of adequate epinephrine absorption, and (ii) that patients could reliably use Anaphylm in an

anaphylaxis emergency. To meet the emergency use requirement, the Company conducted human

factors validation testing with 166 participants.

50.   The FDA defines "[h]uman factors validation testing" as "[t]esting conducted at the

end of the device development process to assess user interactions with a device user interface to

---

[25] 2025 Form 10-K, p. 66.

[26] AQST-108 was the next product for development in the Company's pipeline, and Libervant was Aquestive's only then-commercialized product.

[27] *Id*., p. 64.

identify use errors that would or could result in serious harm to the patient or user."[28]  The FDA

further explained:

> Human factors validation testing is conducted to demonstrate that the ***device can be used by the intended users without serious use errors or problems***, ***for the intended uses and under the expected use conditions***. The testing should be comprehensive in scope, adequately sensitive to capture use errors caused by the design of the user interface, and should be performed such that the results can be generalized to actual use.[29]

51.       The FDA also advised that "[t]he realism and completeness of the human factors

validation testing should support generalization of the results to demonstrate the device's use

safety and effectiveness in actual use."[30] Significantly, the FDA expressly cautioned that "the

human factors validation test results ***should show no use errors or problems that could result in***

***serious harm*** and that could be eliminated or reduced through modification of the design of the

user interface . . . ."[31]

### 2.   The Red Flags in the HFV Study Results

52.       The HFV Study did not satisfy the criteria set out in the FDA guidance. The HFV

Study revealed use errors and problems experienced by study participants that could delay the

administration of epinephrine or cause the administration of an incorrect dose during a potentially

fatal anaphylaxis emergency, making Anaphylm unsuitable for its intended use. Specifically, one

HFV Study participant was a child who was unable to open the Anaphylm child-resistant pouch.[32]

---

[28] *Human Factors* FDA Guidelines, p. 3.

[29]Id., p. 26.

[30]*Id.*, p. 20 (footnote omitted). Because Anaphylm was intended for the emergency treatment of anaphylaxis, such conditions might include patients who are alone and under severe physiological stress, or patients and caregivers who have not carefully read the instructions for use.

[31] *Human Factors* FDA Guidelines, p. 20.

[32] CRL Call Tr., p. 4/23.

This was particularly significant because the Anaphylm NDA includes children weighing 60 pounds or more, and is supported, in part, by a Phase 1 Anaphylm clinical trial involving children between ages 7 and 17.[33] Thus, the Anaphylm packaging design was incompatible with its intended use population. In addition, four (4) HFV Study participants chewed the film instead of using it sublingually; another four (4) participants prematurely removed the Anaphylm from their mouths - two (2) because of taste and two (2) because of a burning sensation – possibly preventing the administration of an adequate epinephrine dose; and six (6) participants tore the Anaphylm while opening the pouch.[34]

53. The use errors and problems uncovered in the HFV Study were, therefore, red flags of the FDA's denial of the NDA based on Aquestive's failure to demonstrate that Anaphylm was suitable for the emergency treatment of anaphylaxis. As the Company acknowledged, "[s]igns and symptoms of anaphylaxis typically occur within seconds or minutes of exposure . . . *If not treated immediately*, *anaphylaxis can lead to death* due to airway restriction or cardiac arrest. . . . Because anaphylaxis can progress quickly, the ability to administer *a reliable and accurate dose of epinephrine as quickly as possible* following a reaction is *critical for patient recovery and survival*."[35] The use errors and problems revealed in the HFV Study – which could delay or affect the accuracy of the epinephrine dose – could not only "result in serious harm,"[36] but were

---

[33] Jennifer Godwin, *FDA Reviewing Oral Epinephrine Film for Possible Approval*, LIVING ALLERGIC (June 15, 2025), https://www.allergicliving.com/2025/06/18/fda-reviewing-oral-epinephrine-film-for-possible-approval/#:~:text=Companies%20submit%20an%20application%20after,product%20by%20January%2031%2C%202026.&text=%E2%80%9CWe%20are%20incredibly%20excited%2C%E2%80%9D,be%20transformative%20for%20anaphylaxis%20care.%E2%80%9D.

[34] Daniel Barber, *Aquestive Therapeutics, Inc. (AQST) Discusses FDA Complete Response Letter and Next Steps for Anaphylm Epinephrine Sublingual Film Transcript* (Feb. 2, 2026).

[35] 2024 Form 10-K, p. 16.

[36] *Human Factors* FDA Guidance, p. 20.

potentially fatal, precluding approval of the Anaphylm NDA.

### C.    The Failure to Remediate the Known HFV Study Deficiencies

54.    The *Human Factors* FDA Guidance provides that "[t]he results of the human factors validation testing *should be analyzed qualitatively* to determine if *the design of the device* (*or the labeling* or user training) *needs to be modified* to reduce the use-related risks to acceptable levels."[37] That analysis is performed by the product sponsor, such as Aquestive. The Individual Defendants, therefore, had access to granular data regarding the HFV Study, including video of the study. For example, during an earnings call after the Company's receipt of the FDA's CRL, Defendant Barber stated that "[i]n *reviewing the study videos*, it is clear the individuals did not read the instructions on the pouch."[38] The Individual Defendants, therefore, knew, or in the exercise of adequate oversight should have known, of the negative HFV Study results *prior* to submission to the FDA.

55.    The *Human Factors* FDA Guidance also states that "[i]f design flaws that could cause use errors that could result in harm are identified and could be reduced or eliminated through design changes, *stating in a premarket submission that you plan to address them in subsequent versions of the device is not acceptable*." Instead, "[d]esign modifications made in response to human factors validation testing results to eliminate or reduce unacceptable use-related risks should be evaluated in a subsequent test to determine whether the design modifications were

---

[37] *Id.*, p. 26. Although not binding, the *Human Factors* FDA Guidance states that "[y]ou can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations." There is no indication that Aquestive used an "alternative approach," but instead, attempted to follow, albeit unsuccessfully, the guidance provided by the FDA.

[38] CRL Call Tr., p. 4/23. To the extent that Defendant Barber states that the four (4) study participants who were incorrectly "chewing the film" is attributable to not receiving or reading the instructions (*id.*), he ignores that the study was conducted under simulated anaphylaxis emergency conditions. *Human Factors* FDA Guidance, p.20. Under such conditions, patients – who are likely to be under severe physiological stress – may not read the instructions.

effective . . . ." [39]  In other words, the FDA guidance provides that remedial actions should be taken, and a new human factors validation study conducted to assess the effectiveness of those remediation efforts, *prior* to submission to the FDA.[40]

56.     Here, however, the Individual Defendants failed to take any actions, whatsoever, to address the use errors and problems revealed in the HFV Study, obviating the need to conduct supplemental human factors validation testing.[41] Instead, the Individual Defendants breached their fiduciary duties by causing Aquestive to submit the deficient HFV Study to the FDA. The Individual Defendants' culpable inaction is inexplicable because remediation of the deficiencies was neither unduly burdensome nor particularly complex.

57.     Thus, approximately one month after receiving the FDA CRL on January 30, 2026, the Company's 2025 Form 10-K, filed on March 4, 2026, stated that "[t]o resolve the FDA's concerns, the Company has modified the pouch opening, instructions for use, pouch and carton labeling, and plans to conduct a new HF validation study with these modifications."[42] In fact, Defendant Barber stated that when Aquestive received the CRL, "*we already had alternate pouch openings and supportive human factors data available for the FDA*, had they engaged us in these discussions. Unfortunately, we never received information requests on the human factors

---

[39] *Human Factors* FDA Guidance, p. 27.

[40] Defendant Barber's complaint that the Company could have addressed those concerns later, during the review process, "which would have afforded us the opportunity to appropriately amend our NDA and risk mitigate these concerns and obtain first round approval" (CRL Call Tr., p. 4/25), completely ignores this unambiguous provision of the FDA guidance.

[41] *Human* Factors FDA Guidance, pp. 20, 37, Appx. C ("Design modifications made in response to human factors validation testing results to eliminate or reduce unacceptable use-related risks should be evaluated in a subsequent test to determine whether the design modifications were effective").

[42] *Id.*, p. 5.

deficiencies received in the CRL."[43]

58.    The Individual Defendants' failure to timely address the red flags of the FDA's denial of the Anaphylm NDA, breached the fiduciary duties they owe to the Company and its shareholders.

### D.    The Misleading Statements

#### 1.    The April 2025 Proxy

59.    On April 25, 2025, Aquestive filed a proxy statement on Schedule 14A with the SEC in anticipation of the Company's scheduled June 11, 2025 Annual Meeting. The April 2025 Proxy was used, *inter alia*, to solicit votes for the election of Defendants Barber and Morris to a three (3) year term as Class I directors, and approve the compensation of the Company's named executive officers on a non-binding advisory basis. The Board recommended that shareholders vote to approve both proposals.[44]

60.    The April 2025 Proxy, however, contained materially misleading statements concerning the scope and effectiveness of the Board's oversight function. The April 2025 Proxy stated "[t]he primary responsibilities of our Board of Directors are to provide oversight, strategic guidance and direction to our management."[45] This statement was materially false and misleading because it failed to disclose that the Board took no corrective actions, nor directed Management to take any corrective actions, to remediate the deficiencies uncovered in the HFV Study submitted to the FDA three weeks earlier. Therefore, the Board did not adequately oversee, or provide

---

[43] CRL Call Tr., 4/23. Barber's statements evince a misapprehension of the FDA's guidance on the human factors validation testing procedures, which provides that deficiencies should be remediated *prior* to submission to the FDA. *Human Factors* FDA Guidance, p. 27.

[44] April 2025 Proxy, pp. 3, 21.

[45] *Id.*, p. 7.

strategic guidance and direction to Management.

61.     The April 2025 Proxy further stated that "Mr. Barber, our Chief Executive Officer, is also a member of the Board, which we believe promotes strategy development and execution and facilitates information flow between management and the Board."[46] The April 2025 Proxy, however, failed to disclose that Aquestive took no remedial actions to correct deficiencies in the HFV Study prior to submitting it to the FDA as part of the Anaphylm NDA. That Defendant Barber, who has had executive responsibility for the Company's product pipeline since 2013, was a member of the Board did not "promote[] strategy development and execution and facilitate[] information flow between management and the Board" because the Board did not direct the Company to take corrective actions to cure the deficiencies in the HFV Study prior to its submission to the FDA.

62.     The April 2025 Proxy also stated that the Board is "responsible for monitoring and assessing *strategic risk exposure*" and that the Science and Technology Committee is responsible for "periodically review[ing] the Company's oversight of risk management in the area of *human studies*, the Company's policies and procedures related to the conduct of human studies and the use and publication of data derived from such studies . . . ."[47]

63.     These statements were materially false and misleading because the April 2025 Proxy fails to disclose the existence of the deficiencies in the HFV Study, the Board's failure to remediate those deficiencies, or the submission of the deficient HFV Study to the FDA. Such actions posed a material strategic risk that the FDA would deny the NDA because Aquestive did not show that Anaphylm was suitable for the emergency treatment of anaphylaxis. Likewise, the

---

[46] *Id*., p. 12.

[47] *Id*., pp. 13, 16.

27

proxy failed to disclose that the Science and Technology Committee did not adequately review the risks posed by the deficient HFV Study – a human study – and/or ensure that appropriate remedial action was taken.

64.    By issuing, and/or causing or permitting the issuance of, the materially false and misleading statements in the April 2025 Proxy Statement, the Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder. In addition, the Individual Defendants breached the fiduciary duties they owed to the Company and its shareholders.

### 2.    The Misleading Public Statements

65.    On June 16, 2025, the Company issued a press release announcing that the FDA accepted the Anaphylm NDA, assigning a PDUFA date of January 31, 2026. The press release quoted Defendant Barber as stating "[w]ith the FDA's acceptance of our NDA, we're one step closer to getting this life-saving innovation in the hands of the patients and caregivers who need it most."

66.    Defendant Barber's statements were materially false and misleading, however, because he knew, but failed to disclose, that HFV Study participants' use errors and problems precluded the DMEPA – whose mission is "[t]o increase the *safe use* of drug products by minimizing use error that is related to the *naming, labeling, packaging, or design* of drug products"[48] – from finding that the HFV Study was adequate for approval of the NDA because the Company failed to show that Anaphylm was suitable for the emergency treatment of anaphylaxis.

---

[48]Chan, PharmD, *Label and Labelling Development: Strategies for Reducing Medication Errors*, p.4 (emphasis in original), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.intmedsafe.net/wp-content/uploads/2018/06/Irene-Chan-IMSN-FDA-June-2018-Presentation.pdf

67.     On August 11, 2025, Aquestive issued a press release reporting its second quarter 2025 financial results. In that press release, Defendant Barber was quoted as stating "[t]he second quarter marked a pivotal step forward for our Company with the FDA's acceptance of our NDA for Anaphylm . . . . With *regulatory progress on track*, we remain focused on execution across clinical, commercial, and operational fronts . . . ."

68.     Defendant Barber's statements were materially misleading because he failed to disclose that the deficient HFV Study submitted to the FDA as part of the Anaphylm NDA did not show that Anaphylm was suitable for its intended use, the emergency treatment of anaphylaxis. Therefore, Anaphylm regulatory progress was not "on track."

69.     On August 12, 2025, the Company conducted an earnings call in connection with its second quarter 2025 results. During that call, Defendant Barber stated:

> We are now less than 6 months away from our FDA action date for Anaphylm . . . . I'm pleased to tell you this morning that we are *on track across the important elements of Anaphylm. We are on track in our FDA review process* . . . .

> We recently submitted our 120-day safety update to the FDA. I'm pleased to say that there was *nothing new or of consequence to report in this safety update*.

70.     During that same call Defendant Barber was asked if "there has been any *other substantial data analysis* or information request from FDA during the review so far?" Defendant Barber replied, "we have had the usual back and forth with the FDA that you would expect to date. There is nothing that I would describe as *a major data set* or anything to that standpoint beyond the standard 120-day safety update."

71.     Defendant Barber's statements were materially false and misleading because he failed to disclose that the deficient HFV Study submitted to the FDA as part of the Anaphylm NDA, did not demonstrate that Anaphylm was suitable for its intended use, namely the emergency

29

treatment of anaphylaxis, precluding FDA approval. Therefore, Aquestive was not "on track" with the "important elements of Anaphylm" or the "FDA review process." Likewise, Defendant Barber's statement there was nothing he would describe "as a major data set" was materially false and misleading because he failed to disclose any information about the HFV Study, let alone the adverse results from that study which precluded FDA approval of the Anaphylm NDA.

72. On November 5, 2025, the Company issued a press release reporting its third quarter 2025 results. Defendant Barber was quoted as stating:

> The third quarter was another period of strong execution for Aquestive as we move closer to the launch of Anaphylm, if approved by the FDA. The FDA's decision not to convene an Advisory Committee further *advances our regulatory path*, and *our NDA remains on track for the scheduled January 31, 2026 PDUFA goal date*.

73. Defendant Barber's statements were materially false and misleading because he failed to disclose that the deficient HFV Study submitted to the FDA as part of the Anaphylm NDA, did not demonstrate that Anaphylm was suitable for its intended use, namely the emergency treatment of anaphylaxis, precluding NDA approval. Therefore, the FDA's decision to forego convening an Advisory Committee meeting did not advance Aquestive's "regulatory path," nor was the Anaphylm NDA "on track for the scheduled January 31, 2026 PDUFA goal date."

74. The following day, November 6, 2025, the Company conducted an earnings call regarding its third quarter 2025 results. During the call Defendant Barber responded to a question concerning "the uncertainty at the FDA" and stated:

> Clearly, the FDA is going through some pains. From our perspective, our review group has remained the same. We did -- as you heard in my prepared comments at the beginning, we've heard from our project manager that our application is not affected. Obviously, we saw the Head of CDER left over the weekend. But from our perspective, the leadership at CDER is more of just a sign-off on our application than an active reviewer. So *we continue to believe we're in good shape on that front*.

75. Defendant Barber's statements were materially false and misleading because he

failed to disclose that the deficient HFV Study submitted to the FDA as part of the Anaphylm NDA, did not demonstrate that Anaphylm was suitable for its intended use, namely the emergency treatment of anaphylaxis, precluding NDA approval. Therefore, that the uncertainty at the FDA had no impact on the Anaphylm NDA did not mean that Aquestive was "in good shape on that front."

76.    By issuing, and/or causing or permitting the issuance of, the materially false and misleading statements referenced above, the Individual Defendants breached the fiduciary duties they owed to the Company and its shareholders.

### E.    The Truth Emerges

77.    Information concerning the Individual Defendants' misconduct was partially revealed on January 9, 2026, in an Aquestive press release reporting that the FDA had notified the Company that "deficiencies in the NDA . . . preclude[d] discussion of labeling and post-marketing commitments at this time" – a prerequisite for approval of the NDA by the January 31, 2026 PDUFA date. On this news, the price of Aquestive common stock declined more than 37%, from a closing price of $6.21 per share on January 8, 2026 to a close of $3.91 per share on January 9, 2026.

78.    More details concerning the Individual Defendants' misconduct were revealed on January 30, 2026, when the Company announced that the FDA had issued the CRL, formally declining to approve the Anaphylm NDA. The CRL confirmed that the NDA denial was based on the deficient HFV Study. According to Aquestive, the CRL specifically cited the "instances of difficulty opening the pouch and incorrect film placement which, if unaddressed, the FDA believes could cause significant safety issues in the setting of anaphylaxis."[49] In addition, the FDA's clinical

---

[49] 2025 Form 10-K, p. 5.

pharmacology division "requested a single PK [pharmacokinetic] study to understand the impact of any modifications to packaging and labeling."[50] In response, Aquestive stated that it "modified the pouch opening, instructions for use, pouch and carton labeling, and plans to conduct a new HFV Study with these modifications."[51] Aquestive estimated that it would be unable to resubmit the revised Anaphylm NDA until the third quarter of 2026.[52]

79.     On this news, the price of Aquestive common stock further declined from a closing price of $3.16 per share on January 29, 2026 to a close of $2.95 per share on January 30, 2026.

## F.     The Harm to Aquestive

80.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered, and continues to suffer, substantial harm. Aquestive not only faces massive potential class-wide liability, but it will also incur significant defense and indemnification costs in the Securities Class Action.

81.     Additionally, the Company will incur expenses that it could have avoided if the deficiencies in the HFV Study had been addressed prior to submission to the FDA. For example, Aquestive must now pay another $4.8 million PDUFA fee for the second Anaphylm NDA; the Company must substantially redo payer contracting work, including  payer agreements and formulary positioning, initially done in anticipation of the January 31, 2026 PDUFA date and product launch in the first quarter of 2026; and the Company has incurred, or will incur, additional costs for conducting the supplemental pharmacokinetic study required by the FDA.[53]

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Had the Individual Defendants followed FDA guidance, Aquestive would have conducted a second human factors validation study following modification of the Anaphylm pouch and instructions. Therefore, the costs of now performing that study do not harm the Company.

82.     In addition, Aquestive has incurred, and will incur, millions of dollars in interest payments that it would not be required to pay, but for the Individual Defendants misconduct, as described below.

**1.   The Senior Secured Notes Interest Payments**

83.     In November 2023, the Company issued $45 million aggregate principal amount of 13.5% Senior Secured Notes due November 1, 2028, bearing interest at a fixed rate of 13.5%, or $6.075 million per year (the "Senior Secured Notes"). In addition, repayment of the $45 million principal of the Senior Secured Notes commences on June 30, 2026 pursuant to a fixed amortization schedule, along with an applicable Exit Fee totaling $2 million.

84.     On August 14, 2025, Aquestive entered a $75 million strategic financing agreement with funds managed by RTW Investments, LP (the "RTW Agreement"). The RTW Agreement, conditioned on FDA approval of the Anaphylm NDA and refinancing of the Senior Secured Notes, was set to close in the first quarter of 2026.[54] The $75 million financing would enable Aquestive to retire the Senior Secured Notes with cash and use the remaining funds for the development and commercialization of Anaphylm.

85.     The RTW Agreement, however, did not close in January 2026 because of the FDA's denial of the Anaphylm NDA. In March 2026, the RTW Agreement was amended to extend the deadline for FDA approval of the Anaphylm NDA to June 2027.[55] Under the amended RTW Agreement, however, the $75 million in financing will not be available to Aquestive until after FDA approval of the Anaphylm NDA, which will not occur until at least the fourth quarter of 2026.

---

[54] Aquestive Current Report on Form 8-K, filed with the SEC on August 14, 2025, Item 1.01.

[55] In exchange for that extension, the Company issued RTW a warrant to purchase 375,000 shares of common stock at $4.00 per share, expiring on March 3, 2029.

86.     Because of the delay in receipt of the $75 million financing, Aquestive could not, and did not, retire the Senior Secured Notes in January 2026. Interest on the Senior Secured Notes, therefore, continues to accrue. Consequently, the Company must make interest payments on the Senior Secured Notes of approximately $1.5 million in the first quarter of 2026, approximately $1.5 million in the second quarter of 2026, and $1.4 million in the third quarter of 2026.[56]

87.     In addition, payments on principal of the Senior Secured Notes principal, approximately $9.5 million, must now be paid by the Company without benefit of the $75 million financing under the RTW Agreement.[57] Even assuming that Aquestive ultimately secures the $75 million in financing under the RTW Agreement, the diversion of $9.5 million will adversely affect the current efforts to develop and commercialize Anaphylm.

88.     The continued accrual of interest on the Senior Secured Notes is directly attributable to the Individual Defendants' wrongdoing. By causing Aquestive to take no remedial action and submit the deficient HFV Study to the FDA, the Individual Defendants ignored red flags that the Anaphylm NDA would be denied. This, in turn, delayed the closing of the RTW Agreement and the retirement of the Senior Secured Notes, causing the continued accrual of interest. The Company's need to pay at least $4.4 million in interest on the Senior Secured Notes is, therefore, harm that would not have occurred but for the Individual Defendants' misconduct. Significantly, further delays in the approval of the Anaphylm NDA will also delay the retirement

---

[56] Aquestive Current Report on Form 8-K Filed with the SEC on November 1, 2023, Ex 4.1, p. A-6, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001398733/000114036123051010/ef20013909_8k.htm.

[57] Aquestive Quarterly Report for the period ended September 30, 2025 filed with the SEC on Form 10-Q on November 5, 2025, p. 21, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001398733/000139873325000028/aqst-20250930.htm.

of the Senior Secured Notes, requiring the Company to make additional interest payments and causing additional harm.

89.    Therefore, Aquestive has suffered, and continues to suffer, substantial harm due to the Individual Defendants' misconduct.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

90.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct giving rise to primary liability, the Individual Defendants further aided and abetted and rendered substantial assistance to each other in the conduct complained of herein. The actions of each Individual Defendant were integral to, and essential to, the misconduct complained of herein by the other Individual Defendants.

## DEMAND FUTILITY ALLEGATIONS

91.    Plaintiff brings this action derivatively in the right and for the benefit of Aquestive to redress injuries suffered, and to be suffered, by the Company as a direct result of violations of Section 14(a) of the Exchange Act, breaches of fiduciary duty, waste of corporate assets, and other violations of law by the Individual Defendants.

92.    The Director Defendants have not commenced, and will not commence, litigation against the Individual Defendants. Accordingly, Plaintiff is commencing this action derivatively to remedy the harm inflicted upon the Company by the Individual Defendants and to prevent continuing damage to Aquestive's business, performance, and reputation.

93.    Plaintiff is a current shareholder of Aquestive, who has continuously held Company stock since 2021. Plaintiff will adequately and fairly represent the interests of the Company in

enforcing and prosecuting its rights.

94.    Plaintiff did not make a pre-suit demand on the Board to institute this action because such a demand would be futile and is, therefore, excused.

95.    The Board consists of seven (7) directors: Defendants Barber, Cochran, Brown, Morris, Taglietti, Krop, and Jenkins. Therefore, Plaintiff must show that at least four (4) of the directors are incapable of exercising disinterested and independent business judgment in considering a demand.

96.    Each of the Director Defendants face a significant likelihood of liability for the wrongdoing alleged herein and/or in the Securities Class Action, and otherwise lack independence from one another and/or from interested parties as set forth below. The Individual Defendants knew, or in the exercise of adequate oversight, would have known, that the use errors and problems in the HFV Study showed that use of Anaphylm in an anaphylaxis emergency posed a risk of serious harm. The use errors and problems were, therefore, red flags that the FDA would deny the Anaphylm NDA because the HFV Study did not demonstrate that Anaphylm was suitable for its intended use. Disregarding applicable regulatory guidance, however, the Individual Defendants failed to cause Aquestive to take any remedial action to address those red flags, instead submitting the deficient HFV Study to the FDA as part of the Anaphylm NDA. By causing Aquestive to rely upon and submit the deficient HFV Study, the Individual Defendants breached the fiduciary duties they owed to the Company and its shareholders.

97.    In addition, the Individual Defendants issued, and/or caused or permitted the issuance of, materially false and misleading statements. Concealing that HFV Study participants experienced use errors and problems that showed that Anaphylm was not suitable for its intended use, and that the Individual Defendants made no attempt to cause Aquestive to remediate those

issues, made the positive statements about the adequacy of the scope and effectiveness of the Board's oversight, strategic guidance, communications with, and the direction provided to, Management, materially false and misleading.

98.     Likewise, the statements concerning the status of the Anaphylm NDA and the FDA regulatory process issued, and/or caused or permitted to be issued, by the Individual Defendants were materially false and misleading because of the undisclosed use errors and problems in the HFV Study that precluded FDA approval of the Anaphylm NDA. The Individual Defendants' deliberate and/or reckless disregard of the red flags in the HFV Study results creates a substantial likelihood of liability in this action which prevents an independent unprejudiced exercise of business judgment.

99.     Each of the Director Defendants is also incapable of considering whether to pursue claims against the Individual Defendants for the following reasons:

a)     Defendant Barber, a director, the CEO, and President of Aquestive, is a Company insider and a named defendant in the Securities Class Action. As the officer with "executive responsibility for Aquestive's pipeline . . . activities," Defendant Barber had direct oversight of the HFV Study. In addition, Defendant Barber issued many of the misleading statements regarding the status of the Anaphylm NDA cited above. Defendant Barber, therefore, faces a substantial likelihood of liability in the Securities Class Action and in this litigation. Additionally, in 2024, Barber was paid a base salary of $633,376, as well as $1,377,968.00 in stock awards; $1,706,036.00 in option awards; $435,600.00 in Non-Equity Incentive Plan Compensation; and additional compensation of $28,492.00, for total compensation of $4,181,472.00. That compensation would be jeopardized by any determination to proceed with claims against the other members of the Board. The significant risk of substantial liability in

37

the Securities Class Action and this action, as well as the risk to his lucrative annual compensation, precludes Defendant Barber's disinterested and independent exercise of business judgment;

b)      Defendant Cochran, a Company director, has been a partner at Bratton, and is responsible for its private equity investments, since 1998. Bratton is the largest institutional holder of Aquestive stock, holding 9,810,958 shares, or 8.04% of all outstanding shares, worth approximately $39,440,000.00. Moreover, Aquestive stock comprises 100% of Bratton's holdings. As a partner in, and a fiduciary of, Bratton, Defendant Cochran cannot exercise disinterested and independent business judgment to investigate allegations of wrongdoing that could potentially implicate the Company and impair the value of Bratton's only asset, its investment in Aquestive stock;

c)      Defendant Brown, Chairman of the Board, and member of the Compensation Committee, Audit Committee, and Science and Technology Committee, failed to ensure the exercise of adequate oversight of the Company's mission critical Anaphylm FDA approval process which included submission of the HFV Study. Defendant Brown either knew, or breached his fiduciary duties by failing to adequately inform himself, of the deficiencies in the HFV Study results. Moreover, despite his fiduciary duties and the specific duties set out in the Company's Governance Guidelines and the Science and Technology Committee Charter, Defendant Brown did not cause Aquestive to take any remedial actions in accordance with the FDA guidelines. By causing and/or permitting the Company to submit the  deficient HFV Study to the FDA as part of the Anaphylm NDA, in disregard of the red flags that the NDA would be denied, Defendant Brown faces a substantial likelihood of liability in this action that prevents his disinterested and independent exercise of business judgment;

38

d)        Defendant Morris, a director, Chair of the Audit Committee, and a member of the Compensation Committee, was responsible for, among other things, ensuring that Aquestive directors, officers, and employees complied with the Company's Code of Conduct. Therefore, in addition to his oversight responsibilities as a member of the Board, Defendant Morris had specific duties under the Governance Guidelines and the Code of Conduct to ensure that all Aquestive directors, officers, and employees complied with all applicable laws. To the extent that the Individual Defendants issued, and/or caused or permitted the issuance of, the materially false and misleading statements alleged above in violation of the federal securities laws, Defendant Morris breached those specific duties. Therefore, Defendant Morris faces a substantial likelihood of liability in this action that prevents his disinterested and independent exercise of business judgment;

e)        Defendant Taglietti, as a director and member of the Audit Committee and the Science and Technology Committee, failed to exercise adequate oversight of the Company's mission critical Anaphylm FDA approval process, which included submission of the HFV Study. Defendant Taglietti either knew, or breached his fiduciary duties by failing to adequately inform himself, of the deficiencies in the HFV Study results. Moreover, despite his fiduciary duties and the specific duties set out in the Company's Governance Guidelines and the Science and Technology Committee Charter, Defendant Taglietti did not cause Aquestive to take any remedial actions in accordance with the FDA guidelines. By causing and/or permitting the Company to submit the  deficient HFV Study to the FDA as part of the Anaphylm NDA, in disregard of the red flags that the NDA would be denied, Defendant Taglietti faces a substantial likelihood of liability in this action that prevents his disinterested and independent exercise of business judgment;

39

f)       Defendant Krop, a director, member of the Nominating and Corporate Governance Committee and the Compensation Committee, and Chair of the Science and Technology Committee, failed to ensure the exercise of adequate oversight of the Company's mission critical Anaphylm FDA approval process which included submission of the HFV Study. According to the Aquestive website, Defendant Krop has "extensive experience in successfully designing and executing clinical development programs from early-stage development through FDA approval," and was recruited as a director because of her "senior leadership roles across clinical development, regulatory affairs, clinical operations, pharmacovigilance, medical affairs and program management during her career in the pharmaceutical and biotechnology industry, as well as her medical background . . . ." [58] Despite her extensive experience, her fiduciary duties, and the duties imposed by the Science and Technology Committee Charter, Defendant Krop failed to exercise adequate oversight of the Company's mission critical Anaphylm FDA approval process which included submission of the HFV Study. Defendant Krop either knew, or breached her fiduciary duties by failing to adequately inform herself, of the deficiencies in the HFV Study results. Moreover, despite her fiduciary duties and the specific duties set out in the Company's Governance Guidelines and the Science and Technology Committee Charter, Defendant Krop did not cause Aquestive to take any remedial actions in accordance with the FDA guidelines. By causing and/or permitting the Company to submit the deficient HFV Study to the FDA as part of the Anaphylm NDA, in disregard of the red flags that the NDA would be denied, Defendant Krop faces a substantial likelihood of liability in this action that prevents her disinterested and independent exercise of business judgment; and

---

[58] https://investors.aquestive.com/corporate-governance.

g)      Defendant Jenkins, a director and member of the Nominating and Corporate Governance Committee, "is an experienced biopharmaceutical executive and board director with more than 25 years of leadership across public and private biotech and pharmaceutical companies."[59] According to the Aquestive website, as the former President, CEO, and director of Gamida Cell, Ltd., Defendant Jenkins "led the company through the FDA approval and launch of Omisirge®, the first-ever allogeneic hematopoietic stem cell donor source approved in the United States."[60] Despite her extensive experience and her fiduciary duties, Defendant Jenkins failed to exercise adequate oversight of the Company's mission critical Anaphylm FDA approval process which included submission of the HFV Study. Defendant Jenkins either knew, or breached her fiduciary duties by failing to adequately inform herself, of the deficiencies in the HFV Study results. Moreover, Defendant Jenkins did not cause Aquestive to take any remedial actions in accordance with the FDA guidelines. By causing and/or permitting the Company to submit the  deficient HFV Study to the FDA as part of the Anaphylm NDA, in disregard of the red flags that the NDA would be denied, Defendant Jenkins faces a substantial likelihood of liability in this action that prevents her disinterested and independent exercise of business judgment.

100.    For the reasons stated above, demand on the Aquestive Board is futile and, therefore, excused.

---

[59] https://investors.aquestive.com/corporate-governance.

[60] *Id.*

## COUNT I

### VIOLATION OF § 14(a) OF THE EXCHANGE ACT AND RULE 14a-9
(Against the Director Defendants)

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully stated herein.

102.    The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

103.    The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the April 2025 Proxy. As alleged above, the April 2025 Proxy, among other things, solicited shareholder votes for the re-election of Defendants Barber and Morris to the Board. In the April 2025 Proxy, the Individual Defendants described the purported oversight of Aquestive's management ("Management"), risk management, major drug developmental programs, and human studies exercised by the Board and its various committees. Those statements were materially false and misleading, however, because the Individual Defendants failed to disclose the oversight failures that caused the Company to submit the deficient HFV Study to the FDA as part of the Anaphylm NDA.

104.    The materially false and misleading statements and material omissions in the April 2025 Proxy improperly induced the Company's shareholders to re-elect Defendants Barber and Morris based, in part, on their purported adequate fulfillment of their oversight responsibilities as members of the Board.

## COUNT II

### BREACH OF FIDUCIARY DUTY
(Against All Individual Defendants)

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully stated herein.

106.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Aquestive's business and affairs.

107.    Each of the Individual Defendants breached his or her fiduciary duties to the Company by ignoring the red flags of the FDA's denial of the Anaphylm NDA; failing to cause Aquestive to take actions to remediate the deficiencies in the HFV Study; causing the Company to rely upon and submit the deficient HFV Study to the FDA as part of the Anaphylm NDA; and issuing, and/or causing or permitting the issuance of, the materially false and misleading statements cited above. Also, the Director Defendants failed to exercise adequate oversight over the Anaphylm regulatory approval process, including the HFV Study, and/or the accuracy of the public statements issued in connection with the Anaphylm NDA, as mandated by the Governance Guidelines, the Code of Conduct, and the Science and Technology Committee Charter. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

108.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Aquestive has sustained and continues to sustain significant damages, as alleged herein, including: (i) exposure to class-wide liability in the Securities Class Action; (ii) the costs of defending itself in that litigation; (iii) incurring costs and expenses related to the restart of Anaphylm commercialization efforts; (iv) incurring costs and expenses related to the revised Anaphylm NDA, including the costs of conducting a supplemental pharmacokinetic study; and (v)

43

paying millions of dollars in interest payments on the Senior Secured Notes.

## COUNT III

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against All Individual Defendants)

109.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully stated herein.

110.  By encouraging and accomplishing the illegal and improper acts alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the *ultra vires* and illegal conduct complained of herein.

## COUNT IV

### WASTE OF CORPORATE ASSETS
(Against All Individual Defendants)

111.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully stated herein.

112.  The wrongful conduct regarding the failure to exercise adequate oversight; the deficient HFV Study; the failure to take corrective action; the submission of a deficient HFV Study to the FDA; the disregard of red flags of the FDA's denial of the Anaphylm NDA; and the issuance of materially false and misleading statements, was continuous, connected, and on-going, resulting in continuous, connected, and ongoing harm to the Company.

113.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) incurring, paying and/or being required to pay legal costs to defend itself in the Securities Class Action; (ii) incurring, paying and/or being required to pay legal

44

costs to defend and indemnify Defendant Barber, who is named as a defendant, in the Securities Class Action; (iii) incurring costs and expenses related to the restart of Anaphylm commercialization efforts; (iv) incurring costs and expenses related to the revised Anaphylm NDA, including the costs of conducting a supplemental pharmacokinetic study; and (v) paying, or being required to pay, millions of dollars in interest payments on the Senior Secured Notes.

114.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

115.    Plaintiff on behalf of Aquestive has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against the Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Aquestive, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act, as alleged herein;

C.    Declaring that the Individual Defendants have breached and/or aided and abetted in the breach of their fiduciary duties to Aquestive;

D.    Declaring that the Individual Defendants have wasted the corporate assets of Aquestive;

E.    Determining and awarding to Aquestive the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon, fashioned in a manner to ensure the Individual Defendants do not participate therein or benefit thereby;

F.      Directing Aquestive and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal controls and procedures to comply with applicable laws to protect Aquestive and its shareholders from repeating the damaging events described herein;

G.      Awarding Aquestive restitution from the Individual Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

H.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, as well as all other fees, costs and expenses reasonably incurred in connection with this action; and

I.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 15, 2026

LAW OFFICES OF JAN MEYER & ASSOCIATES, P.C.

*/s/ David J. Gallacher*
**DAVID J. GALLACHER** (NJ Bar No. 258612018)
JAN MEYER
1029 Teaneck Road, Second Floor
Teaneck, New Jersey, 07666
Telephone: (201) 862-9500
dgallacher@janmeyerlaw.com
jmeyer@janmeyerlaw.com

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Timothy J. MacFall
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414

46

Fax: 212-779-3218
Bernstein@bernlieb.com
TMacFall@bernlieb.com

*Attorneys for Plaintiff Andre Wilson*